Bart C. Miesfeld (126056)
Chance C. Hawkins (216712)
**OFFICE OF THE CITY ATTORNEY**
276 Fourth Avenue
Chula Vista, California 91910
(619) 691-5037 ♦ Facsimile (619) 409-5823

Stephen D. Lucas (74726)
Patricia Jo Custer (128703)
**LUCAS & HAVERKAMP LAW FIRM**
A Professional Corporation
Attorneys at Law
4350 Executive Drive, Suite 260
San Diego, California 92121
(858) 535-4000 ♦ Facsimile (858) 535-4001

Attorneys for Defendants City of Chula Vista, Officer Fred Krafft (erroneously sued as Jeff Craft) and Chief of Police Richard P. Emerson

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ERIC B. HARRIS; MAY HARRIS; HALEY HARRIS, a minor by her Guardian ad Litem, MAY HARRIS; CAMERON HARRIS, a minor by his Guardian ad Litem, MAY HARRIS,

Plaintiffs,

v.

CITY OF CHULA VISTA; OFFICER JEFF CRAFT; CHIEF OF POLICE RICHARD P. EMERSON; DOES 1 – 10, inclusive,

Defendants.

**Case No. 09-CV-2239-JAH (POR)**

**DECLARATION OF STEPHEN D. LUCAS**

Action Filed: October 9, 2009

I, STEPHEN D. LUCAS, declare:

1. I am an attorney licensed to practice law before all courts in the State of California. I am a shareholder in Lucas & Haverkamp Law Firm, and lead counsel for defendants in this matter. The statements herein are based on my own personal knowledge and, if required, I could and would testify to the following.

2. In response to plaintiff attorney Prevost's contention that she tried for months without success to find information concerning a physical altercation in a bar in Kodiak, Alaska involving defendant Fred Krafft and a civil case against him concerning that incident, and her statement that she "finally found the Federal Docket on September 1, 2011," the following chronology of facts demonstrates plaintiff's counsel has failed to exercise due diligence during discovery and lacks good cause for reopening discovery:

a) In April 2010 defendant Krafft answered plaintiff's special interrogatories concerning other claims filed against him, informing plaintiff that "Defendant was sued in federal court in Alaska while he was in the U.S. Navy," but "defendant cannot recall the specific date of the lawsuit or the name of the plaintiff in that case."

b) On March 2, 2011 defendant Krafft testified in his deposition about the Alaska incident and lawsuit, and attached hereto as Exhibit A are true and correct copies of this deposition testimony concerning that matter.

c) On March 3, 2011 (one day after defendant Krafft's deposition) plaintiff subpoenaed records from the Kodiak, Alaska police department concerning the Alaska incident involving defendant Krafft.

d) In order to see how much time it took to find the Alaska lawsuit, I asked my assistant Janis to find the lawsuit using only the information provided by Officer Krafft to plaintiffs. On September 29, 2011 my assistant Janis Moore went on the Federal Court Pacer system and performed a search in the Anchorage, Alaska District Court records utilizing the name Fred Kraft, and within seven minutes obtained the docket information attached hereto as Exhibit B relating to the civil lawsuit filed against defendant Krafft concerning the Kodiak bar incident.

3. On August 29, 2011 the deposition of independent witness, Christopher Reinesch was taken, and attached hereto are true and correct copies of his deposition testimony concerning his observations of defendant Krafft's conduct while arresting Dr. Harris (Exhibit C). The Court will recall Mr. Reinesch as being the "Arizona witness" whom attorney Prevost has repeatedly touted as having witnessed the entire event and

represented to the Court would testify that Officer Krafft brutally beat and assaulted Dr. Harris.   The attached testimony is completely to the contrary; witness Reinesch never observed excessive force or abusive or assaultive conduct on the part of Krafft, nor did he see any police officer do anything that caused injuries to Dr. Harris.

4.      Attached hereto as Exhibit D is a true and correct copy of the Protective Order filed in the case of Christian Morales v. City of Chula Vista which demonstrates "she bitch, F. Prevost" has violated by divulging confidential information.

5.      I have personally confirmed that the settlement agreement in *Morales v. City of Chula Vista* states there is no admission of liability on the part of any defendant.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 30th day of September, 2011 at San Diego, California.

STEPHEN D. LUCAS

Exhibit A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ERIC B. HARRIS, et al.,

Plaintiffs,

vs. Case No.: 09CV2239JAH(POR)

CITY OF CHULA VISTA, et al.,

Defendants.

---

DEPOSITION OF FREDERICK WALTER KRAFFT

Wednesday, March 2, 2011

Chula Vista, California

Reported by Elana Zucconi
CSR No. 9651, RPR, CRR

of station. I was PCSed to Rhode Island for two years; whereupon, I returned to Coronado.

Q. Okay. And you left the Navy in Coronado?

A. I left the Navy in Coronado.

Q. What were you doing in Rhode Island for those two years?

A. I was an instructor.

Q. Of what?

A. Swimming.

Q. Did you maintain your SEAL designation up until your retirement?

A. Yes.

Q. Okay. So when did you officially become a SEAL?

A. I graduated from SEAL training -- I want to say in February of 1983. But it's been a long time, and I am not positive about that.

Q. Okay. While at Kodiak Island, you got into some sort of an incident that resulted in a lawsuit against the United States, am I right about that?

A. Yes.

MR. LUCAS: Just for the record, I will object on the grounds of relevancy. And it is not calculated to lead to the discovery of admissible evidence.

But he can answer the questions.

MR. BECK: Sure.

BY MR. BECK:

Q. Do you understand?

A. I do.

Q. You have heard your wife testify about what she thought caused the lawsuit at her deposition. Tell me what you say caused the lawsuit.

A. I don't understand your question.

Q. According to your wife, if I remember her testimony correctly, you got into an altercation with a bunch of Navy guys somewhere at a bar on one of the islands or someplace off the base --

MR. LUCAS: He just wants you to tell him what you remember happening.

MR. BECK: That's it.

BY MR. BECK:

Q. Tell me.

A. I wasn't sure. While in a nightclub in Kodiak, with my platoon.

Q. With your platoon. How many does that constitute?

A. I am not sure how big the platoon was at that time. Approximately 12 men.

Q. Continue.

A. I was attacked and defended myself.

Q. You were attacked by whom?

A. A local resident.

Q. Explain to me what you mean by an "attack." What happened?

A. I was surrounded by three -- a total of four people, confronted by the person directly in front of me. He reached out, grabbed my by the lapels, thereby assaulting me.

Q. Did he throw a punch at you?

A. He grabbed me by the lapels.

Q. That was it?

A. That was it.

Q. Did you react in any way?

A. I did.

Q. What did you do?

A. I hit him in the face with my head and made him let go.

Q. A head butt?

A. Yes.

Q. Do you know the name of that person?

A. I do not.

Q. Did anyone besides you have a physical confrontation or engagement with that same individual?

A. I don't know.

Q. What prompted this, if you can say, from your

perspective?

A. I don't know.

Q. Had you been drinking?

A. Yes.

Q. Had he been drinking?

A. I don't know.

Q. Had members of the platoon been drinking?

A. I don't know.

Q. All right. Were you injured as a result of this?

A. Yes.

Q. What kind of an injury did you sustain?

A. I had a cut to my forehead.

Q. And this is the result of your having struck this man with your head?

A. The result of defending myself when I was assaulted.

Q. Okay. You characterize it as a defensive maneuver. I am assuming the victim characterized it as an offensive movement, and that's what brought a suit against the United States. Am I right about that?

MR. LUCAS: Objection; calls for speculation. Just tell him what you know, if you know.

THE WITNESS: I was assaulted. He grabbed me, physically assaulted me. I wasn't sure if I would be

stabbed in the back. I wasn't sure if he was going to kick me, punch me. I felt like he was trying to block my hands from protecting myself. I was in fear for my safety and life. I responded and made him let go.

BY MR. BECK:

Q. What became of that subject after you butted him?

A. I don't know.

Q. Did you leave the premises?

A. Immediately.

Q. Were you apprehended at a later time?

A. No.

Q. Were any legal consequences arised from that battery?

A. I made a voluntary statement to the local law enforcement.

Q. So local law enforcement investigated it?

A. No.

Q. Tell me how you got to make a voluntary statement to local law enforcement.

You are talking about civilian law enforcement, correct?

A. Yes.

Q. What agency were you speaking to?

A. The local police, or Sheriffs. I don't recall

which.

Q. Would it have been in the town of Kodiak?

A. I believe so.

Q. All right. And approximately what year would this have happened in?

A. I am not sure. Early -- the early '90s.

Q. Okay. So tell me how it became that you gave a voluntary statement to local civilian law enforcement?

A. I called the local police department and told them there had been an altercation, that I had been assaulted, and I wanted to let them know what happened.

Q. Were any members of your platoon also involved in any part of the fight at the same time, or was this just between you and the subject?

A. I felt that it was between the four other subjects and myself.

Q. So you think the four others were connected to the guy you head butted?

A. I believe so.

Q. Had you seen them in the nightclub earlier?

A. I don't recall.

Q. Was there any kind of a run up to this physical altercation?

A. Not that I recall.

Q. No exchanges of words?

A. Nothing.

Q. Did anyone in the bar -- or in the nightclub attempt to break it up before you left?

A. There was nothing to break up.

(Ms. Prevost enters the deposition room)

BY MR. BECK:

Q. So the answer is no?

A. As soon as he let me go, I left.

Q. Okay. So you left --

MR. BECK: The record should reflect the honorable Mary Prevost is now attending.

BY MR. BECK:

Q. So you left promptly upon striking this guy?

A. Yes.

Q. And did you then promptly call the police?

A. I called the police the next morning.

Q. Well, what time of day did the incident happen?

A. It was in the evening, at nighttime, as I recall.

Q. Is there some reason why you didn't call the police immediately?

A. I didn't think about it until the next morning.

Q. Well, you indicated you sustained an injury. Was that injury visible the next morning?

A. Yes.

Q. How long was it visible for?

A. I don't recall.

Q. Did you receive any medical treatment as a consequence of that injury?

A. I don't recall.

Q. Where did you go after you left?

A. Back to our lodging, our facility.

Q. Did you go alone?

A. Yes.

Actually, no.

Q. Well, what did you do? Who did you go with?

A. We had a driver, a designated driver, who was ferrying people back and forth.

Q. Also a member of the Navy?

A. I believe so, but I don't recall.

Q. All right. Do you remember the names of any of your platoon members?

A. No.

Q. Or the driver, for example?

A. No.

Q. Or the name of the nightclub?

A. Yes.

Q. What is it?

A. I believe it was the Mecca, M-e-c-c-a.

Q. Do you recall what street it was on?

A. No.

Q. But it was in downtown Kodiak?

A. I am not sure there is a downtown Kodiak.

Q. Well, to the extent there could be a downtown for a small place like that.

A. It was, as I recall, near the water, near the piers.

Q. Okay. So you and another person -- or you and the driver left; is that correct?

A. Yes.

Q. Were you intoxicated at the time?

A. No.

Q. Do you believe the subject was?

A. I don't know.

Q. Or his friends?

A. I don't know.

Q. I call them his friends, but the other three men that you described to me, were they, in your judgment, intoxicated?

A. I don't recall.

Q. And this episode between him and you, from beginning to end, lasted how long?

A. I really don't recall. It was over fairly quickly.

Q. Seconds or minutes?

A. It wasn't minutes.

Q. You wouldn't call this a brawl, would you?

A. I would not call it a brawl.

Q. Okay. So you then made a phone call to the local police authorities the following day, as I am understanding you, correct?

A. Yes.

Q. What did you tell them?

A. I told them there had been an altercation, I had been attacked the night before, and I wanted to give them my statement.

Q. Do you know if it was recorded?

A. I don't know.

Q. Do you remember if you were talking to a civilian or to an officer at the time that was done?

A. I don't recall.

Q. How long was the explanation on the phone?

A. I actually made an appointment, went in and gave a statement.

Q. Oh, I misunderstood you.

So you contacted them and then made an appointment to go in and talk to somebody?

A. Yes.

Q. When was that appointment in relation to the call, the same day?

A. Approximately 45 minutes later.

Q. Okay. So you drove over to the police department.

A. I did.

Q. Did you talk to a man or a woman?

A. I don't recall.

Q. And was that interview recorded?

A. I don't recall.

Q. Do you remember anyone taking notes?

A. I don't recall much.

Q. Do you -- can you tell me that a local prosecutor submitted a battery charge against you under Alaska law?

MR. LUCAS: Did they, is that your question?

MR. BECK: Yes.

BY MR. BECK:

Q. Do you know?

A. I don't know.

Q. Were you ever prosecuted?

A. No.

Q. So as far as you were concerned, no criminal case arose from it?

A. As I recall, I was told, as I was leaving, that it didn't appear that there was a criminal case.

Q. This is by the representative of the Kodiak

Police Department?

A. Whomever I spoke to.

Q. Okay. So they gave you some assurance that it wouldn't be passed on to a prosecutor?

A. As I recall.

Q. Okay. And that would account for why there was no prosecution, correct?

A. Yes.

Q. No prosecutor was ever told about it?

A. I don't know.

Q. All right. Do you know whether or not the other subject, or subjects, the four civilians that you described, including the man you head butted, were interviewed?

A. I don't know.

Q. Did you ever learn the names of any of them?

A. If I did, I don't recall them.

Q. Were you given any kind of information, a piece of paper with a case number on it, or something that would suggest that the Kodiak Police Department had some formal paperwork related to the incident?

A. Not that I recall.

Q. All right. Do you know whether or not anyone called the police as you were leaving or while the fight was taking place?

A. I don't know.

Q. You were never told that there was a 9-1-1 call?

A. I was never told.

Q. All right. And you believed that to be true?

A. I don't know.

Q. All right. Well, did -- in your interview, did the officer that you spoke to inform you that they knew of the incident apart from your disclosure?

A. I don't recall being told about them having prior knowledge.

Q. Okay. Did you also report this incident to a commanding officer?

A. I reported it to my supervisor.

Q. Who would that be?

A. It was whomever my lieutenant was at the time.

Q. And was this done when -- well, let me rephrase the question.

When was it done?

A. I don't recall.

Q. Was it done face-to-face? Was it done on the telephone? Was it done within 24 hours of the incident?

A. I believe the lieutenant was up in Alaska as well. I am not sure if I told him that night or the next morning.

Q. The lieutenant to whom the report was made was done because he was in Kodiak too?

A. Yes.

Q. Okay. Do you know if the Navy has any paperwork related to your disclosure of the incident?

A. I don't know.

Q. Have you ever seen any?

A. No.

Q. When you made the disclosure to the lieutenant, was that in accordance with policy that you understood the Navy follows?

A. I don't understand.

Q. Well, when you told the lieutenant about what happened in that nightclub -- excuse me -- was it done in accordance with policy for the agency?

A. As far as policy, that is a law enforcement term. In the military, we have what is called a chain of command. I was advising my chain of command.

Q. Were you advising because you understood you had a duty to do so?

A. I had advised him because I keep my lieutenant informed, that's just --

MR. LUCAS: No. His question is, did you understand that there was some kind of rule or protocol that required you to report to your lieutenant what had

happened?

BY MR. BECK:

Q. That is my question.

A. I don't recall doing it because it was protocol. I recall telling him because that's how I observed the chain of command.

Q. What did you tell him?

A. I told him I had been attacked and I defended myself.

Q. That's it? No details?

A. I don't recall anything else.

Q. All right. Did he ask you to formalize this in any way, write a memo or do something else besides listen to you?

A. I don't recall.

Q. All right. How do you become aware -- and at the completion of the report with the police department and to your lieutenant, that was the end of the episode until you learned of the lawsuit, correct?

A. Yes.

Q. How did you learn that the victim was making a claim against you?

A. I don't recall.

Q. Well, did anybody in the government, Navy or the U.S. Attorney's office, contact you regarding a tort

claim filed by that party?

A. Someone contacted me. I don't recall who.

Q. Do you recall where that person was?

A. No, I do not.

Q. Whether it was in San Diego or Kodiak or somewhere else?

A. I don't recall.

Q. All right. And do you recall being asked about the incident by that party?

A. No.

Q. Was that party an attorney?

A. I don't recall.

Q. All right. Was it telephonic?

A. I don't recall.

Q. Were you sent a letter?

A. I don't recall.

Q. All right. But somewhere along the way, you knew that the government was being sued on account of your actions, correct?

A. Contacted somewhere, somehow.

Q. Did you give a statement to that party?

A. I don't recall.

Q. Were you asked to give a statement?

A. I don't recall.

Q. All right.

MR. LUCAS: I'm sorry, did you ever see a copy of this lawsuit?

THE WITNESS: I don't remember if I did. I don't have a copy of it.

MR. BECK: Well, I wouldn't expect him necessarily to be served with a copy. Because the United States is the only person that can be a party to a tort claim. So I don't know if you ever would have seen it. In our case, where we served you individually, that's different.

BY MR. BECK:

Q. Have you ever seen the suit, the paperwork?

A. I don't recall.

Q. You don't.

Well, you are not remembering, but it could have been?

A. I don't remember what I saw, what paperwork was provided to me.

Q. Okay. Was that the one and only contact you had with a representative of the government inquiring into the claim being made by the victim?

A. I don't recall.

Q. Well, you didn't get deposed, correct?

A. Correct.

Q. Do you know if anybody else was deposed in

relationship to that lawsuit that would have been present, that you know of?

A. Not to my knowledge.

Q. All right. Were any members of your platoon approached, to your knowledge, for information about this altercation?

A. I don't recall.

Q. Okay. After you learned of the lawsuit, did you follow it?

A. I don't understand.

Q. In other words, did you keep abreast of what was happening in the case?

A. I contacted a lawyer.

Q. For yourself?

A. Yes.

Q. What prompted you to do that?

A. Because I wanted to know that I was legally represented.

Q. Well, did you think you needed a lawyer?

A. I don't recall. I thought it was the smart thing to do.

Q. Where was this lawyer? Where did he office?

A. In Alaska.

Q. Kodiak?

A. I don't believe it was Kodiak. I don't recall.

Q. Do you remember the name of the lawyer?

A. I do not.

Q. And you -- you hired that lawyer, or a law firm, for the sole purpose of defending against allegations made arising from that nightclub brawl?

A. I don't recall if that was the case or if it was just put on retainer in case I needed him. I don't remember.

Q. Did you pay this lawyer money?

A. I gave him a deposit, as I recall.

Q. Any -- did he ever give any of it back to you?

A. He did not.

Q. Do you happen to remember his name?

A. I do not.

Q. Do you have any records that would indicate to whom the payment was made?

A. Not that I know of.

Q. Was payment made in cash or by check?

A. I don't recall.

Q. Or a credit card, for that matter?

A. I don't recall.

Q. I'm assuming that once you learned of the existence of the tort claim -- and I don't know if I should assume this -- you were advised that there was to be a lawsuit, correct?

A. I don't recall.

Q. But it was then that you were prompted to hire this attorney? I mean, that triggered it, did it not?

A. Prompted?

Q. What triggered you to hire the lawyer? The notification of the tort claim?

A. I don't remember what prompted me or triggered me.

Q. Did you interview with this lawyer in person or by telephone?

A. By telephone.

Q. Okay. Had you had ongoing conversations with this gentleman?

A. Which gentleman?

Q. In other words, more than the one contact.

A. With the lawyer?

Q. With the lawyer.

MR. LUCAS: And now we have it is a gentleman.

MR. BECK: Well, you are right. I am assuming it is male. With that faux pas.

THE WITNESS: I don't recall.

BY MR. BECK:

Q. You don't know if it was male or female?

A. Oh, I remember it was a male. I don't recall his name. And I don't recall having conversations.

Q. At least one you had, correct?

A. Yes.

Q. Did you sign a retainer agreement?

A. I don't believe so.

Q. Okay. Did that lawyer ever inform you what the result of the tort claim was?

A. As I recall, he advised me later when the claim was dropped.

Q. Dropped or dismissed?

A. I don't recall.

Q. Do you know whether the government paid any money to the victim?

A. I don't believe so, but I am not positive.

Q. Okay. So you had a piece of -- a correspondence from the attorney that told you what the culmination of the claim was?

A. I believe I received a phone call.

Q. Nothing in writing?

A. Not that I recall.

Q. If this incident happened in the early '90s, when was it over, as far as you are concerned?

A. I don't recall how long it lasted.

Q. Several years?

A. I don't recall.

MR. LUCAS: Don't guess.

BY MR. BECK:

Q. Well, did it happen in the same year in which it happened? This is the communication between you and the lawyer.

A. I don't recall.

Q. In your military records, would there be any reference to the incident we are describing?

A. Not that I know of.

Q. Okay. So your military record wouldn't have any annotation that you were involved in this tort claim and/or this incident or had a negative contact with a civilian?

A. Not to my knowledge. I do not believe so.

Q. Have you ever seen your military record?

A. Which record?

Q. Whatever record the Navy keeps on you, what might be called a personnel record.

A. I have seen my pay record. I have seen my health record. I am not sure about my personnel record. I believe I have seen that also, but I am not positive.

Q. And can you tell me, from what you saw of the personnel record, is there any reference to this incident?

A. Not to my knowledge.

Q. So you left -- you were in Kodiak for how long,

that deployment you described to me?

A. I am not sure. Approximately two weeks. It might have been three weeks. I couldn't say for sure.

Q. In what year -- I mean, in what months were you there? The winter, spring, summer?

A. I don't recall.

Q. Were you in training or giving training at that time?

A. I was in training.

Q. What was the training?

A. It was amphibious training.

(Mr. Hawkins enters the deposition room)

BY MR. BECK:

Q. And was the platoon that you described to me as having been to the bar, is that your regular caudry of coworkers assigned out of Coronado?

A. Platoons change. The personnel of platoons change.

Q. The platoon that was in this incident with you, or at the incident when it happened, were these men that were sent from San Diego to Kodiak on that detail?

A. Yes.

Q. Okay. So when you next saw any member from the platoon, you -- later that evening or the next day or any day thereafter, did you get to talk about what

happened?

A. I don't recall.

Q. Can you say you did not talk about what happened with any of the others that were present?

A. I don't recall. It's a long time ago. I don't remember if I did or didn't speak with anyone.

Q. Do you know the names of any of the members of the platoon that we could potentially contact to learn about the details of this incident?

A. I don't remember who was in that particular platoon.

Q. Do you know the names of any of the members of the platoon, reflecting back on it, in San Diego or Coronado, any names?

A. I don't understand your question.

Q. The names --

MR. LUCAS: He wants to know if you know any of the names of the platoon members --

THE WITNESS: Any platoon members that I was ever deployed with?

BY MR. BECK:

Q. That were involved with you in the incident.

A. I don't remember who was in that particular platoon, is what I am saying.

Q. Have you had any contact with any of those

platoon members since leaving the Navy?

A. I don't remember which platoon members they were. I am not sure.

Q. Other than speaking of the incident as a consequence of our lawsuit, have you discussed that incident with anyone?

A. Not that I recall.

Q. Well, you obviously talked to your wife about it, correct? Because she knew.

A. I am not even sure my wife knew the details.

Q. Well, how was she able to testify?

A. I am not sure. Maybe -- maybe she overheard my conversation with my lawyer.

Q. You don't know that to be true, though?

A. I don't know that to be true.

Q. All right. But you never actually explained to her what it was that took place?

A. I don't recall explaining to her.

Q. Were you married at the time?

A. I believe so.

Q. Okay. So to the present wife?

A. To my current wife.

Q. All right. Did you report the incident to her from Kodiak?

A. I don't recall.

Q. All right. Was there ever a time throughout the episode that you were concerned about being criminally charged?

A. No.

Q. From the moment it happened, to after you got through with the police interview?

A. Not that I recall.

Q. Okay. Do you know whether or not that other party was in fact injured?

A. I don't know.

Q. Or received medical treatment on scene?

A. I don't know.

Q. Did you leave so quickly as not to be able to know that this man was down, is that what you are saying to me?

A. I left very quickly.

Q. Do you know if the man was down at the time of your departure?

A. I don't recall.

Q. And before you left, did you see any emergency response by the local police or fire --

A. Not that I recall.

Q. -- or paramedics?

Did the police tell you that this guy was injured such that he needed paramedic assistance?

A. I don't recall.

Q. Okay. Have you been involved in any other similar incident while you were in the Navy, physical altercation?

MR. LUCAS: Bar fight, head butt?

MR. BECK: A fight with anybody. I am talking about a physical altercation where force was used.

MR. LUCAS: That's not part of his training and --

MR. BECK: Precisely. I am not talking about training context. I am talking about the kinds of things that would be frowned upon.

THE WITNESS: I can't recall any specific incidents.

BY MR. BECK:

Q. All right. So this lawsuit, or tort claim incident, is the only one that you can testify to?

A. It is all that I recall.

Q. All right. Have you ever been in a fight, other than the one you just told me about?

A. I have been in fights before where I had to defend myself.

Q. How many?

A. Throughout my life?

Q. Well, say since high school, in your adult

life.

A. Less than ten.

Q. And as an adult, those less than ten --

A. This is as an adult. I am talking high school included.

Q. No. After high school, they don't count, as far as I am concerned. I mean as an adult.

A. As an adult, I can't recall any significant incidents.

Q. Have you had any negative contacts with law enforcement while in the Navy? That includes the military police.

A. Not that I recall.

Q. And the fights that you were describing, and I am not -- well, first of all, you told me you were defending yourself. That you felt your life was threatened.

Did you mean to include life-threatening fights included where something that happened to you in high school?

A. No. I was referring to the Alaska incident where my life was threatened. Protecting myself in high school and elementary school, I imagine.

Q. As you described the incident to me, the guy grabbed your shirt. Why is that life-threatening?

A. I suspected that one of his partners was going to stick a knife in me or hit me from behind with something.

Q. But the gentleman that grabbed you wasn't armed, was he?

A. I don't know.

Q. Well, you saw one of his hands, didn't you?

A. Both of his hands grabbed both my lapels. I don't know. He might have been armed, but just nothing in his hands.

Q. But you didn't see any weapon, because you could make both hands out on your body?

A. I did not see any weapons in his hands.

Q. Okay. So why characterize that then as life-threatening?

A. We had been briefed that in Alaska, the local clubs or hangouts were dangerous, and people were attacked, stabbed, sometimes shot with alarming frequency.

Q. This is a briefing the Navy actually gave you before you went out to this club?

A. This is a briefing the local personnel gave us.

Q. What do you mean "local personnel," people that were permanently stationed there?

A. There were two or three Navy personnel that

lived in Alaska and conducted training.

Q. And they told you that Navy personnel were targets of civilians?

A. That's not what I said.

Q. Well, that's what I interpret it as.

A. They said that people were often beat up, stabbed, sometimes shot, locally in some of those clubs.

Q. Is Kodiak, Alaska considered a high crime area?

A. I don't know.

MR. LUCAS: Have you ever been to Kodiak?

MR. BECK: No.

MR. LUCAS: I haven't either. I have seen a lot about it. It is an interesting place.

MR. BECK: Well, what do I know. I am asking because I don't know.

BY MR. BECK:

Q. All right. Be that as it may, I want to move away from that.

What other fights can you describe for me that you have had in which you felt your life was threatened?

A. I don't recall, in high school, feeling my life was threatened. I just defended myself in high school.

Q. Okay. What about in your post-high school years, either in the Navy or leaving out your career as a police officer? I want to make a separate category of

A. I considered National City and I considered Chula Vista.

Q. Did National City -- did you apply at National City?

A. I did not.

Q. But there certainly was one at Chula Vista?

A. Yes.

Q. Do you recall the year in which that application was made?

A. I believe it was 2000, but I am not positive.

Q. And so Chula Vista is the only employer that -- law enforcement employer that actually offered you employment?

A. Yes.

Q. All right. When were you notified -- first of all, in your application to the Chula Vista Police Department, did you disclose that incident in Kodiak?

A. Yes.

Q. Did your background investigator ask you anything about it?

A. I don't recall.

Q. So there should be some reference to it, since it was less than ten years old at the time, do you think so?

A. I don't know.

Q. And you have no recollection -- who was your background investigator?

A. I had more than one.

Q. Well, tell me their name.

A. Currently, he is lieutenant, Lieutenant Salee.

Q. Spell it.

A. S-a-l-e-e.

Q. Who else?

A. And Agent Halfacre, H-a-l-f, acre.

Q. A-c-r-e?

A. I guess. I am not sure.

Q. And whom else?

A. Those are the two that I recall.

Q. And can you tell me presently that either one of them inquired about the details surrounding the Kodiak incident?

A. I don't know.

Q. All right. But it is your testimony that you disclosed it?

A. Yes.

Q. Was there something on an application that required you to disclose it?

A. I don't recall.

Q. All right.

MR. BECK: Are you looking for a break?

# Exhibit B

CLOSED

**U.S. District Court**
**District of Alaska (Anchorage)**
**CIVIL DOCKET FOR CASE #: 3:95-cv-00219-JWS**

Evans v. United States of America et al
Assigned to: John W. Sedwick
Cause: No cause code entered

Date Filed: 06/15/1995
Date Terminated: 09/25/1997
Jury Demand: None
Nature of Suit: 320 Assault Libel & Slander
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Larry D. Evans**

represented by **Keenan R. Powell**
Attorney at Law
9170 Jewel Lake Road, Suite 102
Anchorage, AK 99502
907-258-7663
Fax: 907-245-0854
Email: keenan@gci.net
*LEAD ATTORNEY*

V.

**Defendant**

**United States of America**

**Defendant**

**Frederick Kraft**

represented by **Jody W. Sutherland**
Law Office of Jody W. Sutherland
310 K Street, Suite 200
Anchorage, AK 99501
907-264-6661
*LEAD ATTORNEY*

**Defendant**

**Matthew D. Rosenbloom**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/03/2006 | | All future filings will be in the CM/ECF System. All documents filed prior to January 3, 2006, are available for review at the Clerk's Office.(SAL2, COURT STAFF) (Entered: 10/22/2008) |
| 01/03/2006 | 47 | Copy of ACMS docket. Click on the hyperlink to access docket entries 1-47 from prior ACMS system.(SAL2, COURT STAFF) Modified on 10/22/2008 (SAL2, COURT STAFF). (Entered: 10/22/2008) |

| PACER Service Center |
|---|
| Transaction Receipt |
| 09/28/2011 14:41:12 |

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ALASKA
CIVIL DOCKET ENTRIES FOR CASE A95-0219--CV (JWS)
"LARRY D. EVANS V USA ET AL"

For all filing dates

Presiding Judge: The Honorable John W. Sedwick, U.S. District Judge
Magistrate Judge:
Referral Rule:
Filed: 06/15/95
Closed: 09/25/97

Jurisdiction: (2) U.S. Defendant
PLF Diversity:
DEF Diversity:

Nature of Suit: (320) Assault, libel and slander
PERSONAL INJURY ACTION
Origin: (1) Original Proceeding
Demand: 9999
Filing fee: Paid $120.00 on 06/15/95 receipt # 00096394
Trial by: Court

| Document # | Filed | Docket text |
|---|---|---|
| 1 - 1 | 06/15/95 | Complaint filed; Summons issued. |
| 2 - 1 | 08/21/95 | DEF 1 motion to dismiss. |
| 3 - 1 | 09/11/95 | JWS Stipulation and Order that pltf has to 9-11-95 to oppose def's mot to dismiss. cy cnsl |
| 4 - 1 | 09/12/95 | PLF 1 Unopposed Motion for ext of time to respond to motion to dismiss. |
| 4 - 2 | 09/14/95 | JWS Order granting pltf a 10-day ext to to oppose def's mot to dimiss. cy cnsl |
| 5 - 1 | 09/26/95 | JWS Minute Order that proof of service is lacking & due w/i 20 days. cy cnsl |
| 6 - 1 | 09/27/95 | PLF 1; DEF 1 Stipulated motion to dismiss def USA. |
| 7 - 1 | 10/02/95 | JWS Order terminating in light of this order: motion to dismiss (2-1) cy cnsl |
| 8 - 1 | 10/25/95 | PLF 1 motion for ext of time to 12-5-95 to publish notice of absent def in newspaper. |
| 9 - 1 | 10/30/95 | JWS Minute Order denying motion for ext of time to 12-5-95 to publish notice (8-1) w/o prejudice to resubmit by 11-7-95 or dismissal will be ordered. cy cnsl |
| 10 - 1 | 11/03/95 | DEF 3 motion for ext to 11-27-95 to file answer to complaint |
| 11 - 1 | 11/07/95 | DEF 2 motion to stay proceedings |
| 12 - 1 | 11/14/95 | PLF 1 Return of Service Executed Attorney General, 7/5/95; M. Rosenbloom 10/17/95; F. Kraft 10/23/95. |
| 13 - 1 | 11/21/95 | DEF 3 motion to dismiss for failure to state claim |
| 14 - 1 | 11/29/95 | JWS Order granting motion for ext to 11-17-95 to file answer to complaint (10-1) cy cnsl. |

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ALASKA
CIVIL DOCKET ENTRIES FOR CASE A95-0219--CV (JWS)
"LARRY D. EVANS V USA ET AL"

For all filing dates

| Document # | | Filed | Docket text |
|---|---|---|---|
| 15 - | 1 | 12/04/95 | JWS Minute Order granting motion to stay proceedings (11-1), status report due 4-30-96, stay will be lifted 20 days after filing of appearance of cnsl for Mr. Kraft unless good cause shown. cy cnsl |
| 16 - | 1 | 12/11/95 | PLF 1 opposition to DEF 3 motion to dismiss for failure to state claim (13-1) |
| 17 - | 1 | 01/08/96 | JWS Order granting motion to dismiss for failure to state claim re def Rosenbloom. (13-1) cy cnsl |
| 18 - | 1 | 01/12/96 | DEF 3 reply to opposition to DEF 3 motion to dismiss for failure to state claim (13-1) |
| 19 - | 1 | 04/29/96 | DEF 2 Attorney Appearance by Jody Sutherland. |
| 20 - | 1 | 05/01/96 | DEF 2 Answer to Complaint |
| 21 - | 1 | 05/06/96 | JWS Minute Order lifting stay at #15, parties to meet by 5-24-96. cy cnsl |
| 22 - | 1 | 05/06/96 | JWS Minute Order that status report due w/i 25 days. cy cnsl |
| 23 - | 1 | 06/03/96 | Joint 26(f) Status Report |
| 24 - | 1 | 06/13/96 | JWS S&P Order re; discovery to close 11/8/96, dispositive ddln 30 days thereafter. cy cnsl. |
| 25 - | 1 | 09/20/96 | PLF 1 Witness List |
| 26 - | 1 | 09/20/96 | JWS Stipulation and Order that D-2 has 14 days (10-4-96) to file witness list. cy cnsl |
| 27 - | 1 | 09/26/96 | PLF 1 Exhibit List [with att exhbts] |
| 28 - | 1 | 10/04/96 | DEF 2 Witness List |
| 29 - | 1 | 11/15/96 | JWS Order Certifying Ready for Trial plft to file status report w/n 15 dys. cc: cnsl |
| 30 - | 1 | 11/19/96 | PLF 1 Status Report |
| 31 - | 1 | 11/22/96 | JWS Minute Order granting request for stat conf; stat conf set for 12/3/96 @ 8:30 a.m. in chambers. cc cnsl |
| 32 - | 1 | 12/03/96 | JWS Minute Order to reset stat conf for 12/12/96 @ 3 PM. cc cnsl |
| 33 - | 1 | 12/13/96 | JWS Minute Order that disc to close 1/31/97; disp mot ddln 2/28/97. cc cnsl |
| 34 - | 1 | 02/11/97 | Order Certifying Ready for Trial plft to file report within 15dys. cc: cnsl |
| 35 - | 1 | 02/18/97 | PLF 1's atty's motion for order permitting withdrawal of counsel with att aff. |
| 36 - | 1 | 03/07/97 | PLF 1 Address Change Notice of Keenan Powell |

Exhibit C

Certified Copy

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ERIC B. HARRIS; MAY HARRIS; HALEY HARRIS, a minor by her Guardian ad Litem, MAY HARRIS; CAMERON HARRIS, a minor by his Guardian ad Litem, MAY HARRIS,

Plaintiffs

vs.

CITY OF CHULA VISTA; OFFICER JEFF CRAFT; CHIEF OF POLICE RICHARD P. EMERSON; DOES 1 - 10, inclusive,

Defendants.

Case No.: 09-CV-2239-JAH(POR)

DEPOSITION OF CHRISTOPHER REINESCH

San Diego, California

August 29, 2011

REPORTED BY: LYNETTE MARIE NELSON, CSR NO. 11585

Peterson Reporting
Truth and Technology, Transcribed.

530 B Street
Suite 350
San Diego, CA
92101

800 649 6353 toll free
619 260 1069 tel
619 688 1733 fax

bookadepo.com

Celebrating
25
years in business
Peterson Reporting
petersonreporting.com

Reporting
Videography
Trial Presentation
Global Reach
Complex Cases
Accurate, Fast

turned him around.

Q. That's fine. But at some point you recall that the plaintiff was turned around?

A. And leaned up against the vehicle.

Q. And leaned up against the vehicle.

And the police officer was where at that time?

A. Behind the plaintiff.

Q. And your recollection was he was leaned up against what part of the vehicle?

A. It was the hood. And this drawing would probably be turned around. I don't know exact ins and outs whatever. But the vehicle was faced in such a way where -- where Eric was leaned against the hood. You could see the kids in the back seat.

Q. And so as I understand your testimony, then, the plaintiff would have been leaned against the passenger side of the hood; is that correct?

A. That's correct.

Q. And by "the hood," you mean the front part of the vehicle, correct?

A. Yes.

Q. And can you estimate for me how far you were away from the plaintiff at that point?

A. I probably moved even a little bit closer.

Q. And I have no idea --

the officer just -- didn't hear a thing from him at all.

I think at that point I believe the plaintiff's wife got back into her vehicle -- or no, actually, she was on the side of it. I believe they went and took him in a car or put him in the car to take him away or whatnot.

Q. When you say "they," you are speaking about --

A. The police officers.

Q. Okay.

A. I went up to the plaintiff's wife and said hey, I just saw everything that happened here. Here's my card, and, you know, this just doesn't seem right.

Q. Do you recall the police officers placing handcuffs on the plaintiff?

A. I do. I don't know if they were the zip-tie or -- I believe they were, but I am not positive.

Q. Do you have any recollection how that was done?

A. When they -- they did it when he was leaned up against the car.

Q. Other than leaning the plaintiff up against the car, did you see the officers -- any of the officers strike the plaintiff?

A. No, I did not.

Q. Did you see them use any of their police tools, I will call tools, which are the baton or the --

A. No.

Q. Did you see any of the officers at any time until they led the plaintiff out of your sight kick the plaintiff?

A. The only thing I remember is that they -- when they patted him down, I think they used their foot to kind of kick his feet apart so they could kind of check and that was it.

Q. Anything else that you saw that you thought other than the arrest itself that was what I will say abusive up until they led him away?

A. No.

Q. During the time that they handcuff him and then -- I am assuming they walked him to a vehicle that you saw?

A. Yeah. Which actually it was out of my sight. I mean, I --

Q. Okay.

A. At that point, once they started to lead him away, that's when I went and gave my card to the plaintiff's wife.

Q. From the point that the plaintiff was handcuffed, up until the point that you see him leave -- led away, do you recall anything else the plaintiff said that you haven't testified to?

Q. This male, what did he say to you?

A. Well, he told me what he was doing as far as he was doing the investigation on the incident that happened out at the Cricket Amphitheater and just kind of asked what my recollection of it was. He asked me a few questions. But I mean it was three years ago. So I don't remember exactly.

Q. Do you recall telling the investigator anything different than what you told me today?

A. I have seen the statement, the statement is not a fair or -- it has some inaccuracies in it.

Q. When did you first see the statement?

A. I can't recall actually.

Q. Was it within the past six months?

A. I have seen a copy of it in the last six months, yeah. But it was probably last week and then prior to that, I mean, I could maybe look on an e-mail or something, but it was probably within the last six months, yeah.

Q. And you were provided the statement by an e-mail?

A. Yes.

Q. From whom?

A. I believe it was the plaintiff's attorney.

Q. And what did the e-mail say?

A. Just to look over this and if there was any inaccuracies or comments or whatever. And I believe I -- I believe I e-mailed back and said that there were some inaccuracies in it. And that's how it was kind of left.

Q. Do you still have that e-mail?

A. I might. I might not. I don't know. I deleted a bunch. I had over 2,000 there and I wiped out a bunch.

Q. Do you know if you kept the statement?

A. I don't have a copy other than what I was e-mailed in the last six months probably.

Q. And you also said that you saw -- received the statement -- excuse me, you also said that you reviewed the statement in the last week; is that correct?

A. I looked through it.

Q. And how did you receive the statement at that time?

A. On an e-mail.

Q. A second e-mail?

A. Actually, I had found it on the first e-mail. I didn't think that I had had it, and then I believe then I found it, then it got sent to me again.

Q. Oh, okay. So within the last week or so you went back and looked to see if you could find the

original e-mail; is that --

A. Correct.

Q. And you did?

A. Yeah.

Q. So by the time they e-mailed you this second e-mail --

A. I found it.

Q. -- you had already started reviewing the statement, right?

A. Right.

Q. And you were doing that because you knew your depo was coming?

A. Well, yeah, I wanted to see where it was at because I remembered there being some inaccuracy in it, so --

Q. What inaccuracies did you e-mail back to them?

A. I think my -- exact words were -- I didn't get into specifics, but I think there were some embellishments on certain things, one of them was the beating, like I never said that. There were certain words that were used in there that was like, okay, that would have never come out of my mouth, so --

Q. Well, if you have either the e-mails you received or your response e-mail, I would ask you to save those, don't delete them.

A. Okay.
Q. You don't know whether or not you have them?
A. I don't.
Q. Do you know whether or not there were any differences in the original statement you had compared to the statement that they just sent you a week or so ago?
A. No, it was the same one.
Q. Well, let me -- let me go ahead and we'll mark this as Exhibit 2 to the deposition transcript.
(Exhibit No. 2 marked for identification.)
BY MR. MIESFELD:
Q. Do you recognize this?
A. I do.
Q. What is it?
A. It was basically the -- the narrative of the statement that I had given to the investigator.
Q. And this is what you were describing was sent to you in two e-mails, correct?
A. Correct.
Q. Other than those two e-mails, did you have any other e-mail correspondence related to this case?
A. Not that I can recall.
Q. Well, let's -- why don't you have a chance to go ahead and review the statement. What I am going to

A. No.

Q. -- needs commenting on?

Let's go to the second.

You see the third line where it has in quotes that you stood there watching the cops go overboard, end quote.

Again, are those the words that you used?

A. That's probably correct.

Q. And you mentioned that you don't believe you described the vehicle as a van, correct?

A. Correct.

Q. About halfway down, it says Mr. Reinesch told me he observed when a Chula Vista police officer, quote, got pissed off for no apparent reason, end quote.

Are those your words?

A. I don't recall saying that.

Q. Is that how you would speak?

A. No.

Q. And then it goes on to say, and, quote, came over, pushed the man, put him in handcuffs and took him away, end quote.

Are those your words?

A. I probably said came over, pushed the man against the vehicle and put him in handcuffs, but it wasn't -- how I would take this is that it sounds like

he pushed him like it was like a --

Q. A hard shove?

A. Yeah, and it wasn't.

Q. It was -- describe for me what kind of push it was.

A. Kind of like he is going to put your hands on you and push you toward something. It isn't like he flung you or anything like that or went up and just shoved the heck out of you.

Q. A guided push, is that a fair description?

A. I would say so, against the vehicle.

Q. Goes on to say, "Mr. Reinesch said he witnessed when the officer abused this unknown man for no reason at all."

A. I did not say that.

Q. It goes on to say, When I ask about the type of abuse, he said they were roughing him and at times beat him."

Did you ever say that?

A. No.

Q. Did you ever see them beating him?

A. No.

Q. Did you ever see the officers roughing him?

A. No.

Q. Goes on to say, "And pushed him into vehicles."

Did you ever see him push him into more than one vehicle?

A. No, the vehicle was -- I mean, again, like I said, I didn't really actually see him -- I know they put him in the car, but I wasn't watching as they put him in the vehicle.

Q. Describing the vehicle he left in?

A. The police vehicle, yeah.

Q. Goes on to say, "pushed him into vehicles causing some injuries."

Did you ever say that?

A. No.

Q. Did you ever see the officers do anything that you believe caused him injuries?

A. No.

Q. It then says, Mr. Reinesch explained, quote, the man was doing nothing to deserve the beating.

Did you ever call it a beating?

A. No.

Q. But it is fair to say you didn't see anything that you believed warranted the arrest?

A. I did not see that warranted the arrest, no.

Q. Next paragraph says, "Mr. Reinesch told me the man, whom he never met before and didn't know anything about him at all, was then surrounded by about eight

cops."

Did you ever say that?

A. I might have said that because I think in here I said probably five to seven, so --

Q. It goes on to say, "and they took him away in a patrol car."

You didn't actually see them take him away in a patrol car, correct?

A. No, I saw them put him in here.

Q. Goes on to attribute you to say, Mr. Reinesch opined that this whole thing was, quote, disgraceful police misconduct.

Did you say that?

A. I think these are some of the words that I would not use.

Q. Goes on to say, "disgraceful police misconduct because the man didn't resist arrest."

That's true to your opinion, correct?

A. Yes, and I probably did say that.

Q. Then goes on to say, "And they (the police) assaulted him."

Did you ever say they assaulted him?

A. No, I did not.

Q. You didn't ever see them assault him, did you?

A. No, I did not.

**LCI INVESTIGATIONS & ASSOSIATES**
243 S. Escondido Blvd., #507
Escondido, CA 92025
760-277-2059
LCI.Investigations@gmail.com

**Investigator's report**

Client: **Eric HARRIS** Date of Incident:10/16/2008

**WITNESS INTERVIEW:**
Chris Ryans REINESCH
745 North Gilbert Rd. #124-310
Gilbert, Arizona 85234
Phone # (602) 723-8480

**INVESTIGATION:**

On 11/1/08 at approximately 1506 hours I left message for Chris Ryans Reinesch (602)723-8480. Mr. Reinesch returned the call moments later and I introduce myself a a private investigator working on behalf of Eric Harris. I asked him if he recalled the incident that occurred on October 16, 2008 at the Cricket Wireless Amphitheater, after the Jimmy Buffet concert. He immediately said to me if this had to do with "the uncalled arrest where the cops went overboard." I told him I was calling about an incident that occurred after the concert.

Mr Reinesch told me he came upon the incident as he was leaving the amphitheater, after the Jimmy Buffet concert and "stood there watching the cops go overboard." Mr. Reinesch volunteered, that as he came upon a traffic jam he saw this guy, he believed that it was Eric Harris, standing on the road leading out of the theater parking lot attempting make room to move his car into the next lane. Mr. Reinesch believes the man was attempting to guide a woman that was driving a van to move into another traffic lane. Mr. Reinesch told me he observed when a Chula Vista police officer "got pissed off for no apparent reason" and "came over, pushed the man, put him in handcuffs and took him away." Mr. Reinesch said he witness when the officer abused this unknown man for no reason at all. When I asked about the type of abuse, he said they were roughing him and at time beat him and pushed him into vehicles causing some

R.3.

**Case Number:**
**Date of Incident:** 10/16/2008
**Case Name:** Eric HARRIS

injuries. Mr. Reinesch explained "The man was doing nothing to deserve the beating."

Mr. Reinesch told me the man, whom he never met before and didn't know anything about him at all, was then surrounded by about eight cops and they took him away in a patrol car. Mr. Reinesch opined that this whole thing was "Disgraceful police misconduct because the man didn't resit arrest and they (The police) assaulted him."

He told me that he was willing to meet with me in person or over the phone because he was willing to do whatever was needed to help this man. I asked again if he knew Mr. Harris and he said he never met the man in his life and the day of the incident at the amphitheater was the first time he ever saw him.

End of report

R.Zamora, P.I.
**Reporting Investigator: Rudy Zamora**

**Date of this Report: 11/20/2008**

# Exhibit D

NUNC PRO TUNC

FEB 06 2008

FILED

2008 FEB 11 PM 12: 12

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY FMR DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTIAN MORALES,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CHULA VISTA; OFFICER M. RODRIGUEZ and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. 07 CV 0186 JM (WMc)<br><br>The Hon. William McCurine, Jr.<br><br>STIPULATED PROTECTIVE ORDER<br><br>Action Filed: January 29, 2007 |

1. PURPOSES AND LIMITATIONS

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting and defending this litigation would be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords extends only to the limited information or items that are entitled under the applicable legal principles to treatment as confidential. The parties further acknowledge, as set forth in Section 10, below, that this Stipulated Protective Order creates no entitlement to file confidential information under seal.

2. DEFINITIONS

2.1 Party: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and outside counsel (and their support staff).

2.2 Disclosure or Discovery Material: all items or information, regardless of the medium or manner generated, stored, or maintained (including, among other things, testimony, transcripts, or tangible things) that are produced or generated in disclosures or responses to discovery in this matter.

2.3 "Confidential" Information or Items: information (regardless of how generated, stored or maintained) or tangible things that qualify for protection under standards developed under F.R.Civ.P. 26(c).

2.4 "Highly Confidential – Attorneys' Eyes Only" Information or Items: extremely sensitive "Confidential Information or Items" whose disclosure to another Party or nonparty would create a substantial risk of serious injury that could not be avoided by less restrictive means.

2.5 Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

2.6 Producing Party: a Party or non-party that produces Disclosure or Discovery Material in this action.

2.7. Designating Party: a Party or non-party that designates information or items that it produces in disclosures or in responses to discovery as "Confidential" or "Highly Confidential— Attorneys' Eyes Only."

2.8 Protected Material: any Disclosure or Discovery Material that is designated as "Confidential" or as "Highly Confidential – Attorneys' Eyes Only."

2.9. Outside Counsel: attorneys who are not employees of a Party but who are retained to represent or advise a Party in this action.

2.10 House Counsel: attorneys who are employees of a Party.

2.11 Counsel (without qualifier): Outside Counsel and House Counsel (as well as their support staffs).

2.12 Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action and who is not a past or a current employee of a Party or of a competitor of a Party's and who, at the time of retention, is not anticipated to become an employee of a Party or a competitor of a Party's. This definition includes a professional jury or trial consultant retained in connection with this litigation.

2.13 Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying; videotaping; translating; preparing exhibits or demonstrations; organizing, storing, retrieving data in any form or medium; etc.) and their employees and subcontractors.

3. SCOPE

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also any information copied or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by parties or counsel to or in court or in other settings that might reveal Protected Material.

4. DURATION

Even after the termination of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs.

5. DESIGNATING PROTECTED MATERIAL

5.1 Exercise of Restraint and Care in Designating Material for Protection. Each Party or non-party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. A Designating Party must take care to designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.

Mass, indiscriminate, or routinized designations are prohibited. Designations that

are shown to be clearly unjustified, or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process, or to impose unnecessary expenses and burdens on other parties), expose the Designating Party to sanctions.

If it comes to a Party's or a non-party's attention that information or items that it designated for protection do not qualify for protection at all, or do not qualify for the level of protection initially asserted, that Party or non-party must promptly notify all other parties that it is withdrawing the mistaken designation.

5.2 Manner and Timing of Designations. Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a), below), or as otherwise stipulated or ordered, material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) for information in documentary form (apart from transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" at the top of each page that contains protected material or otherwise clearly identified as such. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted (either "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY").

A Party or non-party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order, then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL" or

"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY") at the top of each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted (either "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY").

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Party or non-party offering or sponsoring the testimony identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony, and further specify any portions of the testimony that qualify as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." When it is impractical to identify separately each portion of testimony that is entitled to protection, and when it appears that substantial portions of the testimony may qualify for protection, the Party or non-party that sponsors, offers, or gives the testimony may invoke on the record (before the deposition or proceeding is concluded) a right to have up to 20 days to identify the specific portions of the testimony as to which protection is sought and to specify the level of protection being asserted ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY"). Only those portions of the testimony that are appropriately designated for protection within the 20 days shall be covered by the provisions of this Stipulated Protective Order.

(c) for information produced in some form other than documentary, and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." If only portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portions, specifying whether they qualify as "Confidential" or as "Highly Confidential – Attorneys' Eyes Only."

5.3 Inadvertent Failures to Designate. If timely corrected, an inadvertent failure to designate qualified information or items as "Confidential" or "Highly Confidential – Attorneys'

Eyes Only" does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. If material is appropriately designated as "Confidential" or "Highly Confidential – Attorneys' Eyes Only" after the material was initially produced, the Receiving Party, on timely notification of the designation, must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6. CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1 Timing of Challenges. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable substantial unfairness, unnecessary economic burdens, or a later significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2 Meet and Confer. A Party that elects to initiate a challenge to a Designating Party's confidentiality designation must do so in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) with counsel for the Designating Party. In conferring, the challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances and, if no change in designation is offered, to explain the basis for the chosen designation. A challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first.

6.3 Judicial Intervention. A Party that elects to press a challenge to a confidentiality designation after considering the justification offered by the Designating Party may file and serve a motion that identifies the challenged material and sets forth in detail the basis for the challenge. Each such motion must be accompanied by a competent declaration that affirms that the movant has complied with the meet and confer requirements imposed in the preceding paragraph and that sets forth with specificity the justification for the confidentiality designation that was given by the Designating Party in the meet and confer dialogue. The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Until the court

rules on the challenge, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation.

7. ACCESS TO AND USE OF PROTECTED MATERIAL

7.1 Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a non-party in connection with this case only for prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of section 11, below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2 Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated CONFIDENTIAL only to:

(a) the Receiving Party's Outside Counsel of record in this action, as well as employees of said Counsel to whom it is reasonably necessary to disclose the information for this litigation and who have agreed to be bound and have been provided a copy of this Stipulated Protective Order.

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have agreed to be bound and have been provided a copy of this Stipulated Protective Order.

(c) experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have agreed to be bound and have been provided a copy of this Stipulated Protective Order.

(d) the Court and its personnel;

(e) court reporters, their staffs, and professional vendors to whom disclosure is reasonably necessary for this litigation and who have agreed to be bound and have been

provided a copy of this Stipulated Protective Order.

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have agreed to be bound and have been provided a copy of this Stipulated Protective Order. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

(g) the author of the document or the original source of the information.

7.3 Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to:

(a) the Receiving Party's Outside Counsel of record in this action, as well as employees of said Counsel to whom it is reasonably necessary to disclose the information for this litigation and who have agreed to be bound and have been provided a copy of this Stipulated Protective Order.

(b) Experts (as defined in this Order) (1) to whom disclosure is reasonably necessary for this litigation, and (2) who have agreed to be bound and have been provided a copy of this Stipulated Protective Order;

(c) the Court and its personnel;

(d) court reporters, their staffs, and professional vendors to whom disclosure is reasonably necessary for this litigation and who have agreed to be bound and have been provided a copy of this Stipulated Protective Order; and

(e) the author of the document or the original source of the information.

8. PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION.

If a Receiving Party is served with a subpoena or an order issued in other litigation that would compel disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," the

Receiving Party must so notify the Designating Party, in writing (by fax, if possible) immediately and in no event more than three court days after receiving the subpoena or order. Such notification must include a copy of the subpoena or court order.

The Receiving Party also must immediately inform in writing the Party who caused the subpoena or order to issue in the other litigation that some or all the material covered by the subpoena or order is the subject of this Protective Order. In addition, the Receiving Party must deliver a copy of this Stipulated Protective Order promptly to the Party in the other action that caused the subpoena or order to issue.

The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interests in the court from which the subpoena or order issued. The Designating Party shall bear the burdens and the expenses of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

9. UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order.

10. FILING PROTECTED MATERIAL. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material.

11. FINAL DISPOSITION. Unless otherwise ordered or agreed in writing by the Producing Party, within sixty days after the final termination of this action, each Receiving Party must return all Protected Material to the Producing Party. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries or any other form of

reproducing or capturing any of the Protected Material. With permission in writing from the Designating Party, the Receiving Party may destroy some or all of the Protected Material instead of returning it. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the sixty day deadline that identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and that affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or other forms of reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, transcripts, legal memoranda, correspondence, and all material protected by the attorney-client privilege and attorney work product doctrine, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION), above.

12. MISCELLANEOUS

12.1 Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.

12.2 Right to Assert Other Objections. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

13. MODIFICATIONS BY COURT

13.1 The Court may modify this Order sua sponte in the interest of justice.

///

///

///

///

13.2 This Order is subject to further court orders based upon public policy and other considerations.

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

DATED: January 9, 2008

By ______________________
Mary F. Prevost, Esq.
Attorney for Plaintiff CHRISTIAN MORALES

DATED: January 15, 2008

By ______________________
Bart C. Miesfeld, Esq.
Attorney for Defendant CITY OF CHULA VISTA

DATED: January 9, 2008

LIEBMAN, QUIGLEY, SHEPPARD & SOULEMA

By ______________________
James J. Raj, Esq.
Attorney for Defendant CITY OF CHULA VISTA

DATED: January 9, 2008

LEWIS BRISBOIS BISGAARD & SMITH LLP

By ______________________
Peter L. Garchie, Esq.
Attorney for Defendant OFFICER M. RODRIGUEZ

**IT IS SO ORDERED.**

DATED: ~~January~~ February 6, 2008

______________________
The Hon. William McCurine, Jr.                            

**FEDERAL COURT PROOF OF SERVICE**
*Christian Morales v. City of Chula Vista, et al.*
Case No. 07 CV 0186 JM (WMc)

STATE OF CALIFORNIA, COUNTY OF SAN DIEGO

At the time of service, I was over 18 years of age and not a party to the action. My business address is 550 West "C" Street, Suite 800, San Diego, California 92101. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On January 24, 2008, I served the following document(s):
**STIPULATED PROTECTIVE ORDER**

I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

Mary F. Prevost, Esq.
Attorney at Law
402 West Broadway, Suite 950
San Diego, CA 92101
Tel: 619.692.9001 / Fax: 619.255.0726

Ann Moore, Esq.
Bart C. Miesfeld, Esq.
Assistant City Attorney
City of Chula Vista
276 Fourth Avenue
Chula Vista, CA 91910
Tel: 619.691.5037 / Fax: 619.476.5305
bmiesfeld@ci.chulavista.ca.us

James J. Rij, Esq.
Liebman, Quigley, Sheppard & Soulema
110 West "C" Street, Suite 2100
San Diego, CA 92101-3947
Tel: 619.232.0777 / Fax: 619.238.5442
jrij@lqss.com

The documents were served by the following means:

[ ] (BY FAX TRANSMISSION) Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed above. No error was reported by the fax machine that I used. A copy of the record of the fax transmission containing the time, date, and sending fax machine telephone number, which I printed out, is attached.

[X] (BY U.S. MAIL) I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses listed above and I deposited the sealed envelope or package with the U.S. Postal Service, with the postage fully prepaid.

[ ] (BY COURT'S CM/ECF SYSTEM) Pursuant to Local Rule, I electronically filed the documents with the Clerk of the Court using the CM/ECF system, which sent notification of that filing to the persons listed above.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on January 24, 2008, at San Diego, California.

JØNNA WILKINSON

LEWIS BRISBOIS BISGAARD & SMITH LLP
550 WEST "C" STREET, SUITE 800
SAN DIEGO, CALIFORNIA 92101-3540
TELEPHONE (619) 233-1006

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
PETER L. GARCHIE, SB# 105122
VANESSA R. NEGRETE, SB# 239689
550 West "C" Street, Suite 800
San Diego, California 92101
Telephone: (619) 233-1006
Facsimile: (619) 233-8627

Attorney for Defendant, Officer Moises Rodriguez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTIAN MORALES,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CHULA VISTA; OFFICER M. RODRIGUEZ and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. 07 CV 0186 JM (WMc)<br><br>The Hon. William McCurine, Jr.<br><br>**JOINT MOTION FOR DISMISSAL BY STIPULATION**<br><br>Action Filed: January 29, 2007 |

Plaintiff CHRISTIAN MORALES and Defendants CITY OF CHULA VISTA, OFFICER M. RODRIGUEZ, OFFICER SEVERANCE, OFFICER DEANER, OFFICER VICENTE, OFFICER GUTHRIE, OFFICER COLLUM, and CHIEF RICHARD EMERSON by and through their attorneys of record, respectfully submit this Joint Motion for Dismissal of Action With Prejudice pursuant to application of Federal Rule of Civil Procedure, Rule 41(a)(1).

This Joint Motion disposes of the entire action and all claims and counter claims of the remaining parties. All parties are to bear their own costs and attorneys' fees.

**IT IS SO STIPULATED:**

DATED: 9-8-08

By [signature]
Mary F. Prevost, Esq.
Attorney for plaintiff, CHRISTIAN MORALES

DATED: ______________

**THE BECK LAW FIRM**

By ______________
Thomas E. Beck, Esq.
Attorney for plaintiff, CHRISTIAN MORALES

DATED: ______________

______________
Bart Miesfeld, Esq., City Attorney
Attorney for defendant, CITY OF CHULA VISTA

DATED: ______________

**LIEBMAN, QUIGLEY, SHEPPARD & SOULEMA**

By ______________
James J. Rij, Esq.
Attorney for CITY OF CHULA VISTA

550 WEST "C" STREET, SUITE 800
SAN DIEGO, CALIFORNIA 92101-3540
TELEPHONE (619) 233-1006

DATED: ______________

By ______________
Bart Miesfeld, Esq., City Attorney
Attorney for defendants OFFICER SEVERANCE, OFFICER DEANER, OFFICER VICENTE, OFFICER GUTHRIE, OFFICER COLLUM, and CHIEF RICHARD EMERSON

DATED: ______________

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By ______________
Peter L. Garchie
Vanessa R. Negrete
Attorneys for defendant, OFFICER M. RODRIGUEZ

**IT IS SO STIPULATED:**

DATED: ______________ By ______________
Mary F. Prevost, Esq.
Attorney for plaintiff, CHRISTIAN MORALES

DATED: 9/16/08

**THE BECK LAW FIRM**

By ______________
Thomas E. Beck, Esq.
Attorney for plaintiff, CHRISTIAN MORALES

DATED: ______________ ______________
Bart Miesfeld, Esq., City Attorney
Attorney for defendant, CITY OF CHULA VISTA

DATED: ______________

**LIEBMAN, QUIGLEY, SHEPPARD & SOULEMA**

By ______________
James J. Rij, Esq.
Attorney for CITY OF CHULA VISTA

DATED: ______________ By ______________
Bart Miesfeld, Esq., City Attorney
Attorney for defendants OFFICER SEVERANCE, OFFICER DEANER, OFFICER VICENTE, OFFICER GUTHRIE, OFFICER COLLUM, and CHIEF RICHARD EMERSON

DATED: ______________

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By ______________
Peter L. Garchie
Vanessa R. Negrete
Attorneys for defendant, OFFICER M. RODRIGUEZ

LLP 550 WEST "C" STREET, SUITE 800 SAN DIEGO, CALIFORNIA 92101-3540 TELEPHONE (619) 233-1006

**IT IS SO STIPULATED:**

DATED: ______________ By ______________________
Mary F. Prevost, Esq.
Attorney for plaintiff, CHRISTIAN MORALES

DATED: ______________ **THE BECK LAW FIRM**

By ______________________
Thomas E. Beck, Esq.
Attorney for plaintiff, CHRISTIAN MORALES

DATED: 9/25/08 ______________________
Bart Miesfeld, Esq., City Attorney
Attorney for defendant, CITY OF CHULA VISTA

DATED: ______________ **LIEBMAN, QUIGLEY, SHEPPARD & SOULEMA**

By ______________________
James J. Rij, Esq.
Attorney for CITY OF CHULA VISTA

DATED: 9/25/08 By ______________________
Bart Miesfeld, Esq., City Attorney
Attorney for defendants OFFICER SEVERANCE, OFFICER DEANER, OFFICER VICENTE, OFFICER GUTHRIE, OFFICER COLLUM, and CHIEF RICHARD EMERSON

DATED: ______________ **LEWIS BRISBOIS BISGAARD & SMITH LLP**

By ______________________
Peter L. Garchie
Vanessa R. Negrete
Attorneys for defendant, OFFICER M. RODRIGUEZ

09/25/08 THU 11:10 FAX 619 409 5823 CV CITY ATTORNEY 002

**IT IS SO STIPULATED:**

DATED: ____________ By ______________________
Mary F. Prevost, Esq.
Attorney for plaintiff, CHRISTIAN MORALES

DATED: ____________ **THE BECK LAW FIRM**

By ______________________
Thomas E. Beck, Esq.
Attorney for plaintiff, CHRISTIAN MORALES

DATED: ____________ ______________________
Bart Miesfeld, Esq., City Attorney
Attorney for defendant, CITY OF CHULA VISTA

DATED: 9.10.08 **LIEBMAN, QUIGLEY, SHEPPARD & SOULEMA**

By ______________________
James J. Rij, Esq.
Attorney for CITY OF CHULA VISTA

DATED: ____________ By ______________________
Bart Miesfeld, Esq., City Attorney
Attorney for defendants OFFICER SEVERANCE, OFFICER DEANER, OFFICER VICENTE, OFFICER GUTHRIE, OFFICER COLLUM, and CHIEF RICHARD EMERSON

LLP
550 WEST "C" STREET, SUITE 800
SAN DIEGO, CALIFORNIA 92101-3540
TELEPHONE (619) 233-1006

DATED: ____________ **LEWIS BRISBOIS BISGAARD & SMITH LLP**

By ______________________
Peter L. Garchie
Vanessa R. Negrete
Attorneys for defendant, OFFICER M. RODRIGUEZ

Case 3:07-cv-00186-DMS -WMC Document 73 Filed 09/25/08 Page 6 of 7

**IT IS SO STIPULATED:**

DATED: ________________ By ______________________________
Mary F. Prevost, Esq.
Attorney for plaintiff, CHRISTIAN MORALES

DATED: ________________ **THE BECK LAW FIRM**

By ______________________________
Thomas E. Beck, Esq.
Attorney for plaintiff, CHRISTIAN MORALES

DATED: ________________ ______________________________
Bart Miesfeld, Esq., City Attorney
Attorney for defendant, CITY OF CHULA VISTA

DATED: ________________ **LIEBMAN, QUIGLEY, SHEPPARD & SOULEMA**

By ______________________________
James J. Rij, Esq.
Attorney for CITY OF CHULA VISTA

DATED: ________________ By ______________________________
Bart Miesfeld, Esq., City Attorney
Attorney for defendants OFFICER SEVERANCE, OFFICER DEANER, OFFICER VICENTE, OFFICER GUTHRIE, OFFICER COLLUM, and CHIEF RICHARD EMERSON

LLP
550 WEST "C" STREET, SUITE 800
SAN DIEGO, CALIFORNIA 92101-3540
TELEPHONE (619) 233-1006

DATED: September 25 2008 **LEWIS BRISBOIS BISGAARD & SMITH LLP**

By [signature]
Peter L. Garchie
Vanessa R. Negrete
Attorneys for defendant, OFFICER M. RODRIGUEZ

**Morales v. City of Chula Vista, et al.**
U.S. District Court Case No. 07 CV 0186 JM (WMc)

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2008 I electronically filed the foregoing documents with the Clerk of the Court using CM/ECF system which will send notification of such filing to the following email addresses:

Mary F. Prevost, Esq.
Attorney at Law
402 West Broadway, Suite 950
San Diego, CA 92101
Tel: 619.692.9001 / Fax: 619.255.0726

Ann Moore, Esq.
Bart C. Miesfeld, Esq.
Assistant City Attorney
City of Chula Vista
276 Fourth Avenue
Chula Vista, CA 91910
Tel: 619.691.5037 / Fax: 619.476.5305
bmiesfeld@ci.chulavista.ca.us

James J. Rij, Esq.
Liebman, Quigley, Sheppard & Soulema
110 West "C" Street, Suite 2100
San Diego, CA 92101-3947
Tel: 619.232.0777 / Fax: 619.238.5442
jrij@lqss.com

Thomas E. Beck, Esq.
The Beck Firm
10377 Los Alamitos Boulevard
Los Alamitos, CA 90720
Tel: 562.795.5835 / Fax: 562.795.5821

**JOINT MOTION FOR DISMISSAL BY STIPULATION**

[✓] (FEDERAL) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on September 25, 2008 at San Diego, California.

Christine Jordan

LEWIS BRISBOIS BISGAARD & SMITH LLP
550 WEST "C" STREET, SUITE 800
SAN DIEGO, CALIFORNIA 92101-3540
TELEPHONE (619) 233-1006

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTIAN MORALES,<br>Plaintiff,<br>v.<br>CITY OF CHULA VISTA; OFFICER M. RODRIGUEZ and DOES 1 through 10, inclusive,<br>Defendants. | CASE NO. 07 CV 0186 DMS (WMc)<br><br>ORDER OF DISMISSAL<br><br>Action Filed: January 29, 2007 |

The above-captioned action is hereby dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1).

DATED: October 17, 2008

HON. DANA M. SABRAW
United States District Judge

Harris v. City of Chula Vista, *et al.*
USDC Case No. 09-CV-2239-JAH (POR)

**PROOF OF SERVICE**

I, Janis Moore, declare as follows:

I am over eighteen years of age and not a party to this action; I am employed with Lucas & Haverkamp Law Firm, located in the County of San Diego, State of California, and my business address is 4350 Executive Drive, Suite 260, San Diego, California 92121, telephone number 858.535.4000; facsimile number 858.535.4001.

On September 30, 2011, I served the document described as:

**DECLARATION OF STEPHEN D. LUCAS**

on the interested parties in this action as follows:

SEE ATTACHED SERVICE LIST.

☐ **BY MAIL:** placing a true copy thereof enclosed in a postage-paid sealed envelope addressed as above, as follows: I am "readily familiar" with the firm's practice for collection and processing of correspondence for mailing with the United States Postal Service, and that the correspondence shall be deposited with the United States Postal Service this same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒ **BY ELECTRONIC SERVICE;** causing a true and correct copy of the above-entitled document to be served in accordance with the court's specified procedures and addressed to all parties appearing on the Pacer CM/ECF electronic service list for the above-entitled case. The e-service transmission was reported as complete and a copy of the service receipt page(s) will be maintained with the original document in our office.

☐ **BY FACSIMILE TRANSMISSION:** sending a true copy thereof from facsimile number 858.535.4001 to the above-listed facsimile number. The facsimile machine I used complied with Rule 2003(3), and no error was reported by the machine.

☒ (Federal) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. Executed on September 30, 2011, at San Diego, California.

Janis Moore

Harris v. City of Chula Vista, *et al.*
USDC Case No. 09-CV-2239-JAH (POR)

**SERVICE LIST**

Mary F. Prevost
402 West Broadway, Suite 950
San Diego, CA 92101
619.692.9001 / 619.255.0726 fax
mfprevost@aol.com
*Co-Attorneys for Plaintiffs*

Thomas E. Beck
The Beck Law Firm
10377 Los Alamitos Boulevard
Los Alamitos, CA 90720
562.795.5835 / 562.795.5821 fax
becklaw@earthlink.net
*Co-Attorneys for Plaintiffs*

Bart C. Miesfeld / Chance C. Hawkins
Office of the City Attorney
276 Fourth Avenue
Chula Vista, CA 91910
619.691.5037 / 619.476.5303 fax
bmiesfeld@ci.chula-vista.ca.us
chawkins@ci.chula-vista.ca.us
*Co-attorneys for Defendants*